1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| ANTHONY PENTON, | | CASE NO. 06cv233 WQH (PCL) |
|---|---|---|
| | Petitioner, | |
| v. | | **REPORT & RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| SCOTT KERNAN, Warden, | | |
| | Respondent. | |

## I. INTRODUCTION

On January 31, 2006, Anthony Penton ("Petitioner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) A. Malfi[1], Warden, ("Respondent") moved to dismiss the petition for failure to exhaust state court remedies on four of Petitioner's claims, (Doc. No. 9), and this Court issued a Report and Recommendation finding Petitioner's twelfth and thirteenth claims unexhausted. (Doc. No. 18.) On October 6, 2006, Petitioner filed a First Amended Petition ("Petition") presenting only exhausted claims (Doc. No. 21.) On March 28, 2007, Respondents filed an Answer to the Petition along with a Memorandum of Points and Authorities in support thereof, (Doc. No. 28 at Part 1, 3), and lodged portions of the state court record

---

[1]Scott Kernan, Warden, was originally named as one of the respondents. However, he was terminated on October 2, 2006.

("Lodgment").  (Id. at Part 4.)  Petitioner lodged portions of the state court record on May 4, 2007.  (Doc. No. 29.)  Petitioner also filed a Traverse ("Trav.").  (Doc. No. 35.)  After reviewing the Petition, Respondent's Answer, and Petitioner's Traverse, this Court recommends[2] that Petitioner be **DENIED** habeas corpus relief.

## II.  FACTUAL BACKGROUND & STATE PROCEEDINGS

A.    The Attempted Robbery and the Car Chase

On June 26, 1999, two black males attempted to rob Symbolic Motors ("Symbolic"), (Lodgment 11 at 1), a car dealership in La Jolla, California.  (Lodgment 2 at 43.)  In the course of the perpetrators' unsuccessful attempt to obtain the keys to Symbolic's safe, they "attempted to rob, imprison, and terrorize five Symbolic employees, one customer, and two daughters of one of the employees." (Lodgment 11 at 1.)  The perpetrators held the various Symbolic employees at gunpoint and compelled them to move to the back of Symbolic's showroom, forcing them to lie face down on the floor. (Lodgment 2 at 106-111.)  They took a car key out of a victim's pocket.  (Lodgment 5 at 6.)   A few victims saw one of the perpetrators use a cellular phone several times while they attempted to rob Symbolic.  (Lodgment 2 at 325-28; 43-5.)

At one point during the attempted robbery, the perpetrators forced a Symbolic employee and his daughters to an upstairs area.  (Lodgment 2 at 159, 320-323.)  Once there, one perpetrator removed two handguns and duct tape from a plastic bag he was carrying, and taped the employee's arms behind his back.  (Id.)  He then remained upstairs with the children[3] and the employee while the other Perpetrator went back downstairs.  (Id.)  Approximately one-half hour later, one of the employees in the downstairs area ran out of Symbolic, and the perpetrators fled the building shortly after.  (Lodgment at 112-15, 157, 165.)  Another employee within Symbolic then dialed 911 on her cell phone.  (Lodgment at 165.)  When the police arrived at the scene, the perpetrators were not at Symbolic.  However, a field evidence

---

[2]This Report and Recommendation is submitted to United States District Judge William Q. Hayes, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

[3]The employee's two daughters were six and eight years old when the Symbolic robbery took place.  (Lodgment 5 at 5.)

1   technician recovered a plastic bag in the upstairs area of Symbolic.  Edward Jones' fingerprints were

2   found on the bag.  (Lodgment 2 at 176, 184-85, 245-46.)

3       A few days later, on June 29, 1999, San Diego Police Officer Andrew Spears spotted Jones

4   speeding in a tan rental car at 10:00 a.m.  (Doc. No. 21 at 164.)  When Spears approached Jones in his

5   police car, Jones sped up and turned into an alley.  Spears turned on his lights and sirens and pursued

6   Jones.  (Lodgment 2 at 264-65.)  While in pursuit, Spears saw Jones throw a gun out of the window of

7   his car.  Spears eventually stopped Jones and placed him under arrest at 10:02 a.m.  (Doc. No. 21 at

8   161.)

9   B.    Police Investigation

10      After Jones' arrest, the police conducted a search of the tan rental car and found a holster under

11  the driver seat that fit the gun Jones' threw out the window.  (Lodgment 2 at 266-67.)  Police also

12  determined that Petitioner had rented the tan rental car three weeks prior to the robbery incident at

13  Symbolic.  (Lodgment 2 at 259, 265.)  About one and half hours after Jones' arrest, Petitioner called the

14  police.  He gave a statement claiming that the rental car was stolen and that he had called Enterprise

15  Rental Car prior to calling the police.  (Doc. No. 21 at 162.)  Petitioner stated that on June 29, 1999,

16  before Jones' arrest, he and Jones drove to Fam-Mart.  Petitioner claims that he left Jones with the car

17  and went in the store to buy a shirt.  (Id.)  When Petitioner returned from the store, the car was gone.

18  (Id.)  Police also interviewed an employee of Fam-Mart.  The employee stated that on June 29, 1999,

19  Fam-Mart opened at 10:00 a.m. and that he saw a black male enter sometime after the store opened.  (Id.

20  at 163.)  He also stated that the black male did not tell him his car was stolen until 10:45 a.m.  (Id.)  The

21  police officer who made the report stated in the report that he did not believe Petitioner's story.  (Id. at

22  162-63.)

23      In further investigating the robbery, police detective Johnny Keene obtained records of phone

24  calls made during the morning of the Symbolic incident.  (Lodgment 2 at 282-294, 304.)  He learned

25  that thirty-two phone calls had been made between two cell phone numbers in the La Jolla area before,

26  during, and after the robbery.  (Id.)  The two phone numbers belonged to two people, Crini Ornelas and

27  Tim Walker.  However, while investigating the social security and driver's license numbers given to the

28  cell phone company by these two individuals, Keene discovered that the numbers did not match the

3

06cv233

1  name Tim Walker, and suspected that the name was an alias.  (Id.)  Keene contacted Crini Ornela.  She

2  stated that she had never subscribed to a cell phone.  He reviewed other phone numbers which the cell

3  phone numbers called, and determined that the Crini Ornelas cell phone had called two of Petitioner's

4  cell phones.  Keene determined that Tim Walker's cell phone number had called Petitioner's home

5  phone numbers in Victorville and Phoenix.  (Id. at 282-294, 308-09.)

6        Keene executed a search warrant at Petitioner's home and found a tablecloth with Petitioner's

7  nickname and the alias' cell phone number written on it.  Police found a box of .45-caliber ammunition

8  and a key chain with the logo for Enterprise Rental Car, which listed the make, model, and license plate

9  number of the tan rental car Jones was driving when he was arrested.  (Lodgment 2 at 303-06.)  They

10  also found a California Identification Card that had Petitioner's picture, but listed the name "Tony

11  Lamont Walker." (Id. at 310.)

12        Two victims of the Symbolic robbery were able to identify Petitioner and Jones as Perpetrators in

13  photographic lineups and live lineups.  (Lodgment 2 at 60-72, 335-43.)  However, three other victims

14  were unable to identify either Jones or Petitioner in lineups.  (Lodgment 2 at 138-41, 115-18, 165.)

15        The police also learned that Petitioner was possibly staying at the address 4168 Lochlomond, in

16  the Kearny Mesa area of San Diego during August of 1999.  (Lodgment 1 at 426.)  They maintained

17  surveillance of the area until they saw a black male, who looked like Petitioner, get into a car and drive

18  off.  The police confirmed the person's identity with a neighbor and arrested the person.  However, once

19  the police detained him, they discovered that the black male was not Petitioner but a man named Thess

20  Good.  (Lodgment 1 at 427.)  Good was an ex-convict with a history of arrests for burglary, felony

21  assault, attempted murder, auto theft, and possession of firearms.  (Id.)  After questioning Good, the

22  police found out that Good was a friend of  Petitioner.  Good eventually agreed to help the police find

23  Petitioner.  (Id.)  Good called Petitioner, who had left the city, and asked him to come to San Diego.

24  (Id.)  Petitioner refused to return.  Nonetheless, the police were able to get two of Petitioner's phone

25  numbers through Good.  (Id.)

26  C.    Court Proceedings

27        On November 1, 2000, Petitioner was charged in an amended information, in case number SCD

28  147553, with one count of Robbery and five counts of Attempted Robbery in violation of California

06cv233

1    Penal Code ("Penal Code") section 211, and two counts of False Imprisonment by Violence, Menace,

2    Fraud, Deceit in violation of Penal Code section 236 and 237(a).  (Lodgment 1 at 24-28.)  The amended

3    information also alleged that Petitioner personally used a fire arm in violation of section 12022.5(a)(1)

4    during the commission or attempted commission of all of the above crimes.  (Id.)  In addition, the

5    amended information alleged that Petitioner was convicted of two prison priors pursuant to Penal Code

6    sections 667.5(b) and 668, one of which is a serious felony and strike prior under California's Three

7    Strikes law pursuant to Penal Code sections 667.5(b), 668, 1192.7(c), and 1170.12.  (Lodgment 1 at 28-

8    29.)  Petitioner waived formal reading of the information, pleaded not guilty, and denied all allegations

9    and priors.  (Lodgment 1 at 248.)

10        The trial began on November 1, 2000.  (Lodgment 1 at 248.)  Prior to the presentation of

11   evidence, the attorney for the state moved to exclude from the trial Petitioner's statement regarding his

12   call to report the tan rental car stolen.  (Lodgment 2 at 6.)  Petitioner acknowledged that the statement

13   was hearsay, but argued that it was potentially exculpatory evidence and should be admitted.

14   (Lodgment 5 at 9.)  The court ruled that the statement amounted to inadmissible hearsay, and reasoned

15   Petitioner could take the stand and testify about the statement if he wished.  (Lodgment 2 at 8.)  The

16   court ruled to exclude the statements from trial.  (Id.)

17        Several victims of the Symbolic incident testified on behalf of the prosecution.  The two victims

18   who identified Petitioner and Jones as the perpetrators in lineups also identified them at trial.

19   (Lodgment 2 at 60-72, 335-43.)  One of the victims, who was unable to identify Petitioner at a

20   photographic lineup, was able to identify him at trial.  (Lodgment 2 at 138-41.)  The two other victims

21   who testified could not identify Petitioner at trial.  (Lodgment 2 at 115-18, 165.)

22        The victims who testified also described the perpetrators.  One of the victims who identified

23   Petitioner as the taller perpetrator, described Petitioner as a tall, thin, and nicely dressed black man.

24   (Lodgment 2 at 44.)  She recalled Petitioner to have been about 6 feet, 2 inches, 200 pounds when the

25   robbery took place.  (Id. at 53.)  There were minor discrepancies in other victims' descriptions of the

26   taller perpetrator's height and weight. Some victims guessed that he was around 6 feet tall when they

27   saw him during the Symbolic robbery, while another guessed he was 6 feet, 4 inches tall.  (Id. at 107,

28   134, 336.)  One victim testified that he was "not skinny, not heavy", (Id. at 156), while another

1   described him as tall and skinny.  (Id. At 336.)  Some of the victims testified that they recalled seeing

2   the taller perpetrator use a cell phone several times during the robbery.  (Id. at 43-45; 325-28.)

3       Detective Johnny Keene also testified on behalf of the prosecution, divulging information he had

4   discovered concerning the Symbolic incident, Petitioner, and Edward Jones to the court and jury.

5   (Lodgment 2 at 280-318.)

6       Scott Fraser, Ph.D., a neurophysiologist, testified on behalf of Petitioner and stated that research

7   indicated the type of identification made in this case could be inaccurate.  However, Fraser could not say

8   whether the eyewitnesses in this case accurately identified Petitioner and Jones.  (Lodgment 2 at 384-

9   85.)

10      On November 8, 2000, the jury found Petitioner guilty on all counts, (Lodgment 1 at 105-112),

11  and the trial court found true that Petitioner had been convicted of the priors alleged  in the information[4].

12  (Lodgment 1 at 257.)  After considering prior convictions pursuant to California's Three Strikes Law

13  and aggravating factors in the commission of the crime pursuant to California's Determinate Sentencing

14  Law[5], the judge sentenced Petitioner to 54 years and 8 months in state prison.  (Lodgment 1 at 440.)

15      Jones filed a motion for a new trial.  (Lodgment 5 at 9.)  Jones' wife's sister, Janice Thomas,

16  testified on his behalf at the motion hearing.  (Lodgment 2 at 630-41.)  She testified that she dated

17  Petitioner at the time of the car chase and the Symbolic incident.  (Id.)  She further stated she informed

18  Petitioner of Jones' arrest on June 29, 1999, in the afternoon, and Petitioner thereafter told her that he

19  was going to report the car stolen.  The court denied Jones' motion.  (Id.)

20      Like Jones, Petitioner also filed a motion for a new trial.  (Lodgment 1 at 388.)  Petitioner claimed

21  that the prosecution did not timely disclose portions of a police report, which contained a statement by

22  Petitioner claiming that he had called to report his rental car stolen.  (Lodgment 5 at 11.)  Petitioner's

23  motion was argued and heard before the court in a proceeding separate from Jones'.  (Lodgment 1 at

24

25      [4]Petitioner was convicted of Robbery, CAL. PENAL. CODE § 211, in 1988.  (Lodgment 1 at 4-5.)
    The 1988 Robbery conviction is considered a serious felony prior and a strike prior under California's
26  Three Strikes law.  (Lodgment 1 at 5.)  Petitioner was also convicted of another prison prior in 1986, but
    that prior was neither a serious felony or a strike prior under California's Three Strikes law.  (Lodgment
27  1 at 5.)

28      [5]California's Determinate Sentencing Law is described in more detail in section IV (G) (1) of
    this Report and Recommendation.

06cv233

461.)  The trial court, after considering the testimony given by Janice Thomas at Jones' hearing, denied Petitioner's motion for a new trial.  (Id.)  The trial court concluded that Thomas's testimony effectively showed Petitioner's theory, that Jones stole the car from him, made no sense.  (Lodgment 2 at 711-14.)  While the trial court did not believe Thomas was credible, it concluded that Petitioner had a chance to develop his theory simply by testifying.  Moreover, the court found that Jones could have done the same thing by testifying and calling Thomas to testify during trial.  (Id.)  The jury then could have determined Thomas's credibility.  Because the opportunity for Petitioner to develop his theory was available and he simply chose not to testify, the trial court denied Petitioner's motion for new trial.  (Id.)

Petitioner appealed to the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment 3.)  On October 2, 2002, the Court of Appeal reduced Petitioner's sentence to 52 years and 8 months in state prison, but otherwise affirmed the judgment.  (Lodgment 5.)  Petitioner filed a Petition for Review in the California Supreme Court, (Lodgment 6), but the petition was denied on January 15, 2003.  (Lodgment 7.)

On April 11, 2004, Petitioner filed a Petition for Writ of Habeas Corpus in the San Diego County Superior Court.  (Lodgment 8)  On May 5, 2004, the court denied the Petition.  (Lodgment 9). Petitioner then filed a Petition for Writ of Habeas Corpus in the California Court of Appeals, Fourth Appellate District, Division One, on August 3, 2004, but that court denied the Petition in a reasoned opinion on September 14, 2004.  (Lodgment 10,11.)  Finally, Petitioner filed a Petition for a Writ of Habeas Corpus with the California Supreme Court on November 8, 2004, (Lodgment 12), and filed two Supplemental Petitions for the court to consider.  (Lodgment 13,14.)  Petitioner also filed a motion with the Superior Court in California, requesting trial transcripts for his 1988 prior conviction.   However, the Superior Court denied his motion.  (Doc. No. 21 at 79-88.)  The California Supreme Court denied all Petitions without out comment or citation on January 18, 2006.  (Lodgment 15.)

### III.  STANDARD OF REVIEW

Under United States law, a federal district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).

7

06cv233

1   The application for such a writ should be granted only in two circumstances.  First, the writ

2 should be granted if the adjudication of the claims in state court "resulted in a decision contrary to, or

3 involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

4 Court of the United States."  28 U.S.C.A. § 2254(d)(1).  A state decision is contrary to Supreme Court

5 authority only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on

6 a question of law or if the state court decides a case differently than the Supreme Court on a set of

7 materially indistinguishable facts.  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2001).  A state

8 court decision unreasonably applies Supreme Court authority, if it correctly identifies the governing

9 legal principle from Supreme Court precedents but "unreasonably applies that principle to the facts of

10 the prisoner's case."  Id. at 413.  However, an unreasonable application of the law is different from an

11 incorrect application of the law.

12   Habeas corpus relief may not be granted simply because the state court applied "federal law

13 erroneously or incorrectly."  Taylor, 529 U.S. at 411.  A petitioner must also show that the application

14 was a result of an unreasonable analysis of federal law.  Id., Woodford v. Visciotti, 537 U.S. 19 (2002).

15 While a state court's conflict with "Ninth Circuit precedent on a federal Constitutional issue" is

16 insufficient to warrant a grant of the writ, they may be "persuasive authority for purposes of determining

17 whether a particular state court decision is an 'unreasonable application' of Supreme Court law."

18 Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000) (citing Moore v. Calderone, 108 F.3d 261,

19 264 (9th Cir. 1997)).  Even when a state court has either ruled contrary to, or unreasonably applied,

20 federal law, a petitioner still must show that the court's decision had "substantial and injurious effect or

21 influence in determining the jury's verdict" so as to cause actual prejudice.  Brecht v. Abraham son, 507

22 U.S. 619, 637 (1993.)  In other words, but for the state's erroneous conclusions or application of the law,

23 the petitioner would have received a more favorable outcome.

24   Second, the writ should be granted if the adjudication of the claims in state court "resulted in a

25 decision that was based on an unreasonable determination of the facts in light of the evidence presented

26 in the state court proceeding."  28 U.S.C.A. § 2254(d)(2).  However, federal habeas corpus cannot be

27 utilized to try state issues de novo,  Milton v. Wainwright, 407 U.S. 371, 377  (1972); factual

28 determinations by the state court are presumed reasonable "absent clear and convincing evidence to the

06cv233

1   contrary." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 123 (2003); <u>see</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47

2   (1981) (stating that deference is owed to factual findings of both state trial and appellate courts).  Thus,

3   a petitioner's conclusory allegations unsupported by facts from the record are insufficient to warrant

4   habeas corpus relief.  <u>Boeheme v. Maxwell</u>, 423 F.2d 1056, 1058 (9th Cir. 1970.)  Even if the state

5   court's factual determination is flawed, an application of a writ of habeas corpus should not be granted

6   unless an error  "resulted in a complete miscarriage of justice." <u>Hill v. United States</u>, 368 U.S. 424, 428

7   (1962).

8          When reviewing the merits of a petitioner's habeas corpus claim, a federal court should look to

9   the last reasoned state court opinion as the basis of the state court's decision.  <u>Robinson v. Ignacio</u>, 360

10  F3d 1044, 1045 (9th Cir. 2004).  If the state court decides a claim on the merits but does not provide a

11  reasoned opinion for their decision, the federal court should independently review the record to

12  determine the merits of that claim.  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Delgado v.</u>

13  <u>Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2002).  However, even when independently reviewing a claim,

14  the federal court must "still defer to the state court's ultimate decision." <u>Pirtle v. Morgan,</u> 313 F.3d

15  1160, 1167 (9th Cir. 2002)

16                              **IV. DUE PROCESS & RIGHT TO CONFRONTATION**

17         Petitioner alleges that his federal constitutional right to confrontation was violated when the

18  court considered Janice Thomas's testimony, given in a separate hearing, in denying his motion for a

19  new trial.  (Doc. No. 21 at 13-21; Trav. at 1-13.)

20         Petitioner further alleges that his constitutional right to due process was violated when the court

21  denied his motion for a new trial.  He contends the prosecution did not timely disclose to defense

22  counsel a portion of a police report, which contained a statement made by Petitioner claiming that the

23  rental car Jones was driving at the time of his arrest was stolen.  (<u>Id.</u>)  Petitioner claims that the report is

24  exculpatory evidence, and that if Petitioner had the report earlier, he could have better prepared a

25  defense.  (<u>Id.</u>)  Petitioner maintains that because failure to disclose the report was a due process

26  violation during trial proceedings, the trial court should have granted the his motion for a new trial.  He

27  claims the denial of his new trial motion was therefore a violation of due process.

28

                                                            **9**

1   The California Supreme Court rejected both claims without comment.  (Lodgment 15.)

2   However, the state appellate court rejected both claims in a reasoned opinion on direct appeal.

3   (Lodgment 5.)  This Court considers the reasoning developed in the state appellate court's opinion,

4   Robinson, 360 F3d at 1045, and finds that the state court's rejection of these claims  was not an

5   unreasonable applications of, or contrary to, clearly established federal law as determined by the

6   Supreme Court.

7   A.    Confrontation

8          The Confrontation Clause of the Sixth Amendment provides that the accused has the right "to be

9   confronted with the witnesses against him."  U.S. CONST. amend. VI.  The U.S. Supreme Court

10  ("Supreme Court") explained that the primary object of the confrontation clause was to "prevent

11  depositions or ex parte affidavits being used against the prisoner in lieu of a personal examination and

12  cross-examination of the witness" at trial.  Mattox v. U.S., 156 U.S. 237, 242  (1895).  Cross-

13  examination gives the accused an opportunity, not only to "test the recollection and [sift] the conscience

14  of the witness," but also to compel "him to stand face to face with the jury in order that they may look at

15  him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether

16  he is worthy of belief."  Id. at 242-43. The Confrontation Clause, therefore, is designed to prevent

17  improper restrictions on the types of questions that defense counsel may ask during cross-examination,

18  Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987), and to use physical confrontation at trial to enhance

19  "the accuracy of fact finding by reducing the risk that a witness will wrongfully implicate an innocent

20  person."  Maryland v. Craig, 497 U.S. 836, 846 (1990).

21         The Supreme Court held the right to be applicable to the states through the Fourteenth

22  Amendment because the right to confrontation is "an essential and fundamental requirement for the kind

23  of fair trial which is this country's constitutional goal."  Pointer v. State of Texas, 380 U.S. 400, 405

24  (1965).  However, "the right to confrontation is a trial right,"  and thus does not apply to other court

25  proceedings that are not part of the jury trial.  See Ritchie, 480 U.S. at 52 (emphasis in original) (holding

26  that a defendant does not have right to confrontation in a pretrial hearing).

27         In this case, Petitioner motioned for a new trial, claiming that the trial court errored when it

28  excluded portions of a police report that contained Petitioner's statement about the tan rental car.  Janice

10

1   Thomas testified at Jones' hearing for his new trial motion.  She claimed she informed Petitioner that

2   Jones was arrested and, in response, Petitioner told her that he was going to call the police to report the

3   tan rental car stolen.  (Lodgment 5 at 9.)   The trial court considered her testimony and denied

4   Petitioner's motion for a new trial.  (Lodgment 2 at 712.)  Petitioner claims that he was deprived a

5   chance to cross examine Thomas in his post-conviction, new trial motion hearing.  (Doc. No. 21 at 13.)

6   Petitioner maintains this violated his right to confrontation.  (Id.)  The appellate court rejected his claim,

7   reasoning that Jones' wife's testimony was only a portion of the evidence considered by the court in

8   denying Petitioner's motion for a new trial.  (Lodgment 5 at 16.)  The state appellate court explained,

9   "[o]f primary importance was the fact that [Petitioner]'s report to police of the vehicle being stolen was

10  within his own knowledge and he could have testified to these facts at trial.  His election not to testify,

11  however, rendered any claim of prejudice in the People's failure to turn over the actual report of no

12  moment."  (Id.)

13         In order to be entitled to habeas corpus relief, a petitioner must show that the state court's

14  decision was an unreasonable application of, or contrary to, federal law, 28 U.S.C.A. § 2254(d)(1), and

15  that the state court's conclusion prejudiced the petitioner.  Brecht, 507 U.S. at 637 (1993).  The Court

16  finds that Petitioner has failed to demonstrate either.  First,  Petitioner does not have a right to

17  confrontation at a post-conviction new trial motion hearing because the right is a trial right.  Ritchie, 480

18  U.S. at 52.  He was not deprived of the opportunity to cross examine Janice Thomas at trial because she

19  was not a witness.  (Cf. Lodgment 2 at vi; Cf. Lodgment 2 at x.[6])  The jury did not consider Jones'

20  wife's testimony, and their verdict was not influenced by her potentially inculpating statements.  (Cf.

21  Id.)  Therefore, her testimony did not influence the jury to "wrongfully implicate an innocent person."

22  Craig, 497 U.S. at 846 (1990).

23         Second, assuming arguendo that Petitioner had a right to confrontation at his new trial motion

24  hearing, Petitioner still is not entitled to relief because the failure to cross-examine Thomas did not

25  prejudice him.  Brecht, 507 U.S. at 637 (1993). While the trial court considered Janice Thomas'

26  "incriminating" statements, it found her untrustworthy.  (Lodgment 2 at 711-14.)  Therefore, the trial

27

28         [6]Page vi of Lodgement 2 is a list of witnesses who testified at trial.  Page x has a list of Jones'
    witnesses who testified at his new trial motion hearing.  Janice Thomas' name is not on page vi, but is
    on page x.  She testified at the new trial motion hearing, but did not testify at trial.

06cv233

1    court did not deny Petitioner's motion because Thomas inculpated Petitioner.  Rather, the trial court

2    denied Petitioner's motion because he had a chance to develop his theory, even after the trial court

3    excluded the police report of Jones' arrest from the trial. As the state appellate court explained,  "[o]f

4    primary importance was the fact that [Petitioner]'s report to police of the vehicle being stolen was

5    within his own knowledge and he could have testified to these facts at trial."  (Lodgment 5 at 16.)

6    Regardless of Thomas's disbelieved testimony, the trial court would have come to the conclusion that

7    Petitioner had the opportunity to testify about the events described in the police report, (Lodgment 5 at

8    16), and denied his motion.  Because the failure to confront Janice Thomas did not result in a less

9    favorable outcome for Petitioner, he was not prejudiced, and is not entitled to habeas corpus relief.

10   Brecht, 507 U.S. at 637.

11   B.    Due Process

12          In a criminal case, "suppression by the prosecution of evidence favorable to an accused...violates

13   due process where the evidence is material either to guilt or to punishment, irrespective of the good faith

14   or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Therefore, the prosecution

15   has a duty to disclose evidence that is materially favorable to the accused, even if the accused does not

16   request it.  Strickler v. Greene, 527 U.S. 263, 280 (1999).  Favorable evidence encompasses both

17   impeachment and exculpatory evidence.   United States v. Bagley, 473 U.S. 667 (1985).  Evidence

18   favorable to the defendant is material "if there is a reasonable probability that, had the evidence been

19   disclosed to the defense, the results of the proceeding would have been different."  Id. at 682.

20          Here, Petitioner claims the prosecution was late in disclosing portions of the police report of

21   Jones' arrest. (Doc. No. 21 at 13-21.)  The portion in question contained Petitioner's statement

22   describing the events immediately preceding Jones' arrest[7].  (Doc. No. 21, 163.)  While the disclosure

23   was late, the trial court did not believe the tardiness amounted to a due process violation.  The trial court

24   thus rejected Petitioner's motion for a new trial.  (Lodgment 2 at 708-14; Lodgment 5 at 11-12.)  The

25   appellate court applied the Brady standard and affirmed the trial court's judgment, reasoning: 1)

26   Petitioner's counsel acknowledged that the police report was inadmissible hearsay; 2) Petitioner was

27

28          [7]In Petitioner's statement, he claims that he and Jones drove to Fam-Mart the morning of the
     arrest.  Petitioner maintains he left the car with Jones and went in the store to get a shirt.  When he
     returned to the car, he discovered that Jones had driven off with it.  Petitioner claims he called the police
     to report his car missing shortly after discovering that his car was missing.  (Doc. No. 21 at 163.)

                                                        12                                              06cv233

1   obviously aware he made a statement and could have testified to it regardless of whether or not the

2   prosecutor turned the report over to the defense; and 3) the information was not exculpatory for

3   Petitioner.  (Lodgment 5 at 14-16.)  The court concluded that there was no reasonable probability the

4   outcome of the proceedings would have been different had the police report been turned over

5   punctually.  (Id.)

6          The Court finds that the state appellate court reasonably applied federal law as determined by the

7   Supreme Court.  28 U.S.C.A. § 2254 (d)(1).  First, defense counsel acknowledged that Petitioner's

8   statement in the report was inadmissible hearsay.  (Lodgment 5 at 15.)  As such, even if that portion of

9   the report was timely disclosed, it would not have been admissible.  (Id.)  Second, the information in the

10  police report was available to Petitioner prior to its disclosure.  (Id.)  Petitioner knew what he had said to

11  the police when he called to report the tan rental car missing.  He, therefore, could have chosen to take

12  the stand and tell the jury what happened between him and Jones prior to the car being stolen.  Despite

13  Petitioner's contention that his statement was exculpatory, he chose not to take the stand.  (Id.)

14         Third, the California Court of Appeals reasonably concluded that the belatedly disclosed portion

15  of the police report was not exculpatory.  While the police report does include a statement that weakens

16  the link between Jones and Petitioner, the statement was made by Petitioner, and upon scrutiny, appears

17  to be untrustworthy.  Petitioner's statement regarding the rental car is inconsistent with a statement

18  given by the Fam-Mart employee within the same police report.  (Doc. No. 21 at 163.).  Petitioner stated

19  that on June 29, 1999, he drove with Jones to Fam-Mart where his car was stolen; he had left Jones in

20  the car and entered the store to buy a shirt.  (Lodgment 1 at 404.)  The Fam-Mart employee stated that a

21  black male did not enter the store until sometime after the store opened at 10:00 a.m.  Furthermore, the

22  black male did not tell the employee that his car was missing until 10:45 a.m., approximately 45 minutes

23  after Jones had been arrested.  (Id.)  Given that Spears spotted Jones at 10:00 a.m. and pursued him for a

24  while before arresting him at 10:02 a.m., (Lodgment 1 at 264-65; Doc. No. 21 at 162-64.),  Jones must

25  have driven off from Fam-Mart sometime before 10:00 a.m., before Petitioner entered the store.  Yet

26  Petitioner insists that Jones drove off  after he had entered Fam-Mart.

27         The timing of Petitioner's call to the police was also peculiar.  The officer who wrote the police

28  report stated that Petitioner called to report the car missing at about 11:30 a.m., approximately one and

    half hour after Jones was arrested.  (Lodgment 1 at 264-65.)  It was also approximately 45 minutes after

1   he had told the Fam-Mart employee that his car was missing.  (Lodgment 1 at 404.)  In observing the

2   timing of the call and the inconsistencies between the stories provided by the witnesses, it is apparent

3   Petitioner contacted the police in an attempt to distance himself from Jones and the vehicle.  Therefore,

4   the court's conclusion, that Petitioner only called the police after learning of Jones was arrested, was

5   reasonable.  (Lodgment 5 at 9.)  Petitioner statement was more inculpatory than exculpatory,

6   diminishing his credibility.

7       Regardless of the truth of Petitioner's assertions about the morning of June 29, 1999, the

8   Symbolic incident occurred three days earlier.  The report does not contradict that some of the Symbolic

9   incident victims identified Petitioner as one of the perpetrators during the robbery on June 26, 1999.

10  Nor does the report put in question other circumstantial evidence recovered during police's search of

11  Petitioner's house[8].  Even assuming that Petitioner's story is true, Petitioner is still connected to Jones,

12  who is connected to the crime scene.  Therefore, the appellate court reasonably inferred that the

13  untimely disclosed information was not exculpatory evidence because Petitioner's statement would not

14  have refuted other inculpating evidence presented at trial.

15                          **V.  EX POST FACTO CLAUSE**

16      Petitioner argues that he obtained his strike prior conviction before California's Three Strikes

17  law was enacted[9] and, therefore, enhancing his sentence because of his prior is a violation of the Ex Post

18  Facto Clause of the U.S. Constitution.  (Doc. No. 21 at 23; Trav. at 20-23.)  Petitioner presented this

19  claim to the Superior Court of California, and that court rejected it in a reasoned decision.  (Lodgment 9

20  at 3.)  The Superior Court held that "the use of a prior conviction which predates the three strikes law to

21  sentence a defendant under that law does not violate the *ex post facto* provisions of either the state or the

22  federal constitution."  (Lodgment 9 at 3.)  Petitioner also presented this claim to the California Supreme

23  Court in a writ of habeas corpus. The state high court rejected the claim without comment.  (Lodgment

24

25      [8] In a search of Petitioner's house the police recovered ammunition, a key chain with the tan
26  rental car information on it, a table cloth with a phone number written on it, and an apparently fake
    California Identification card with Petitioner's photograph, but the name "Walker" listed.  This evidence
27  links Petitioner to Jones and links Petitioner to the cell phone numbers called thirty-two times in the La
    Jolla area before, during, and after the robbery.  (Lodgment 2 at 303-10.)

28      [9]Petitioner was convicted of his strike prior in 1988.  (Lodgment 1 at 4-5.)  California's Three
    Strikes law became effective on March 7, 1994.  People v. Cargill, 38 Cal. App. 4th 1551, 1554-55, 45
    Cal. Rptr. 2d 480 (Cal. Ct. App. 1995).

1   12 at 4B, 13-14; Lodgment 15.)  Therefore, the Court looks through to, and considers, the Superior

2   Court's decision.  <u>Robinson</u>, 360 F.3d at 1045.

3          The U.S. Constitution prohibits states from passing any *ex post facto* laws.  U.S. CONST. art. I, §

4   10, cl. 1.  The U.S. Supreme Court defined an *ex post facto* law to be one that "retroactively...increase[s]

5   the punishment for criminal acts,"  <u>Collins v. Youngblood</u>, 497 U.S. 37 (1990).  However, the

6   application of a sentence enhancing law based on prior convictions is not "invalidly retroactive" simply

7   because one of the prior convictions took place before the enactment of the law.  <u>See</u> <u>Gryger v. Burke</u>,

8   334 U.S. 728, 732 (1948).  In <u>Gryer</u>, the Court explained that an enhanced sentence based on a prior

9   conviction should not be "viewed as...an additional penalty for the earlier crimes."  <u>Id.</u>  Instead, it should

10  be viewed as a "stiffened penalty for the latest crime, which is considered to be an aggravated offense

11  because [it is] a repetitive one."  <u>Id.</u>  More recently, the Ninth Circuit also held that "application of a

12  sentencing enhancement law due to a prior conviction does not violate the Ex Post Facto Clause" as

13  long as they are not retroactively applied to triggering offenses.  <u>Brown v. Mayle</u>, 283 F.3d 1019 at 1040

14  (9th  Cir. 2002), <u>vacated on other grounds</u>, <u>Mayle v. Brown</u>, 538 U.S. 901 (2003); <u>United States v.</u>

15  <u>Sorenson</u>, 914 F.2d 173, 174 (9th Cir. 1990).

16         Here, California's Three Strikes law enhances sentences of criminals who are convicted of a

17  crime after its enactment.  CAL. PENAL. CODE. §§ 667.5(b), 668, 1192(a).  The Three Strikes law

18  enhances the sentences of such criminals based on their prior convictions.  CAL. PENAL. CODE. §§

19  667.5(b), 668, 1192(a).  As noted above, Supreme Court authority permits a law like California's to

20  enhance the sentence of a criminal whose prior convictions occurred before its enactment.  <u>See</u> <u>Gryer</u>,

21  344 U.S. at 732.  Specifically, the Ninth Circuit held that application of California's Three Strikes law

22  against a criminal whose prior conviction occurred before the law's enactment was constitutional.

23  <u>Brown</u>, 283 F.3d at 1040 (9th  Cir. 2002), <u>vacated on other grounds</u>, <u>Mayle v. Brown</u>, 538 U.S. 901

24  (2003).  Petitioner's sentence was enhanced by the Three Strikes law.  (Lodgment 1 at 440.)  The

25  Supreme Court would explain Petitioner's sentence enhancement as a  "stiffened penalty" for his latest

26  crime because it is an aggravated offense due to its repetitive nature[10] rather than increased punishment

27

28

_____

[10]Petitioner was convicted of Robbery, CAL. PENAL. CODE § 211, in 1988 before being convicted
of Robbery, CAL. PENAL. CODE § 211, again in the instant case.  (Lodgment 1 at 4-5.)

06cv233

1  for his earlier conviction.  See Gryer, 344 U.S. at 732 (1948).  Therefore, the Three Strikes law is not an

2  *ex post facto* law as applied in Petitioner's case.

3  **VI.  VAGUENESS**

4  Petitioner further contends that California's Three Strikes law is void for vagueness.  Petitioner

5  claims the law does not "specifically list 'ROBBERY PEN. C 211' and 'HS 11350 (a)' as a prior

6  conviction of a felony," and therefore the qualifying priors are not clearly defined.  (Doc. No. 21 at 27;

7  Trav. at 24-31.)  Petitioner presented this claim only to the California Supreme Court.  The California

8  Supreme Court reviewed this claim and rejected it without comment.  (Lodgment 12 at 4B, 13-14;

9  Lodgment 15.)  The Court independently reviews this claim and finds it meritless.  Himes, 336 F.3d at

10  853; Delgado, 223 F.3d at 981-82.

11  The Constitution is designed  to "maximize individual freedoms within a frame work of ordered

12  liberty."  Kolender v. Lawson, 461 U.S. 352, 357 (1983).  A statute that limits such freedoms must be

13  "examined for substantive authority and content as well as for definiteness and certainty of expression."

14  Id.  Thus, the "void-for-vagueness doctrine requires that a penal statute define the criminal offense with

15  sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner

16  that does not encourage arbitrary and discriminatory enforcement."  Id.  For vagueness challenges to

17  statutes which do not involve First Amendment freedoms, a court should examine the statute "in the

18  light of the facts of the case at hand."  United States v. Powell, 423 U.S. 87, 92 (1975).

19  A statute is sufficiently definite only if the legislature "establishes minimal guidelines to govern

20  [its] enforcement."  Smith v. Goguen, 415 U.S. 566, 574 (1974).  Accordingly, in Kolender, the Court

21  held that a California statute "requiring persons who loiter or wander on the streets to provide a

22  'credible and reliable' identification and to account for their presence when requested by a police

23  officer" was unconstitutionally vague.  461 U.S. at 574.  Justice O'Connor explained, "[the statue]

24  contains no standard for determining what a suspect has to do in order to satisfy the requirement to

25  provide a 'credible and reliable' identification.  As such, the statute vests virtually complete discretion

26  in the hands of the police to determine whether he has satisfied the statute."  Id.  The Supreme Court's

27  main concern was that this lack of clarity had the potential to lead to the arbitrary suppression of the

28

06cv233

freedoms of speech and movement because the law seemingly allowed a person to walk freely on a public street "only at the whim of any police officer." See id.

The Court must now examine whether California's Three Strikes law, as it is phrased, uses minimal guidelines in determining when sentences should be enhanced. Smith, 415 U.S. at 574. For the purpose of sentence enhancement, the Three Strikes law defines a qualifying prior conviction as "any offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7 as a serious felony." CAL. PENAL. CODE. § 667 (d)(1). If a criminal's prior conviction is for  a crime listed in subdivision (c) of either section 667.5 or 1192.7, then it may be used to enhance the sentence for his latest offense. The state court may not arbitrarily decide whether a prior is a serious or violent felony, it must impose sentence enhancements only if the prior is one of the listed offenses. CAL. PENAL. CODE. § 667.5 (d)(1). Through reference, California's Three Strikes law sets minimal guidelines on which prior convictions may be used to enhance sentences.

As applied to Petitioner, California's Three Strikes law is not unconstitutionally vague. Under Section 1192.7, subdivision (c), robbery is listed as an serious felony offense. CAL PENAL. CODE. § 1192.7(c)(19). Under Section 667.5, subdivision (c), robbery is listed as a violent felony. CAL. PENAL. CODE § 667.5 (c)(9). The trial court found that Petitioner had been convicted of robbery in 1988. (Lodgment 1 at 28-29.) Because robbery is listed as both a violent felony and a serious felony, the court imposed a sentence enhancement based on Petitioner's 1988 prior conviction. The court  did not arbitrarily impose an enhanced sentence on Petitioner, but instead relied on clearly defined qualifying priors. As such, the state court's rejection of this claim was not inconsistent with the Supreme Court's void-for-vagueness doctrine.

## VII. INSUFFICIENT EVIDENCE

Petitioner claims there was insufficient evidence presented at trial to show that he was one of the perpetrators during the Symbolic robbery. (Doc. No. 21. at 28-31;Trav. at 32-43.) The state courts rejected this claim without comment.[11] (Lodgment 15.) As there is no state court opinion to review, the

---

[11]The Superior Court of California did provide a reasoned analysis regarding Petitioner's issue with the disclosure of the police report of Edward Jones arrest, which was under the heading "DISCOVERY AND SUFFICIENCY OF EVIDENCE CLAIMS." (Lodgment 9 at 3.) However, the Superior Court did not address whether the evidence presented at trial was sufficient to convict

Court independently reviews this claim and finds that it is without merit.  Himes, 336 F.3d at 853 (holding that the court should "perform an 'independent review of the record' to ascertain whether the state court's decision was objectively reasonable."); Delgado, 223 F.3d at 981-82.

Under Supreme Court authority, a habeas corpus petitioner has a valid claim for insufficient evidence only if "it is found that upon the record evidence adduced at trial  no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 324  (1979).  When reviewing the record, the federal court should view "the evidence in the light most favorable to the prosecution."  Id. at 319.  Thus, a rational trier of fact can rely on "the testimony of one witness, if solidly believed," to find the defendant to be the perpetrator of the crime.  United States v. Ginn, 87 F.3d 367, 369 (9th Cir. 1996).

In Petitioner's case, two victims identified him as one of the perpetrators at photo lineups, live lineups, and at trial.  (Lodgment 2 at 60-72, 138-41, 335-43.)  Two telephone numbers linked to Petitioner had made thirty-two phone calls from and to the La Jolla area the morning of the Symbolic robbery.  (Lodgment 2 at 282-94, 304.)  Jones' fingerprints were found at Symbolic, (Lodgment 2 at 176, 184-85, 245-46), and Petitioner had rented the car that Jones was driving when he was arrested.  (Lodgment 2 at 259, 265.)  Not only was there one "solidly believed" witness who testified against Petitioner, there were additional witnesses and a plethora of other inculpating circumstantial evidence presented at trial.  Ginn, 87 F.3d at 369.  Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact, could have easily found Petitioner to be one of the perpetrators of the Symbolic robbery.

## VIII. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Petitioner claims that his trial counsel was ineffective.  He contends that his trial counsel failed to spend time to: 1) interview Thess Good and William Diglio;[12]  2) investigate a meeting that Symbolic victims had following the robbery; 3) bring to the jury's attention the transcript of one of the victim's

---

Petitioner.  No reasoned opinions regarding the insufficiency issue from the state appellate court was lodged with this Court.  The Supreme Court of California rejected this claim without comment.  (Lodgement 15.)

[12]Diglio's name appears for the first time in Petitioner's Petition for Writ of Habeas Corpus.  No mention of Diglio appears in the records of this case.

06cv233

911 calls; and 4) investigate what people at neighboring businesses witnessed prior to the robbery. (Doc. No. 21 at 33-35; Trav. at 44-56.)  Had his trial counsel done the above, Petitioner maintains there would have been substantial third party culpability and misidentification evidence that could have changed the outcome of the proceedings.  The state appellate court and the California Supreme Court did not address these claims.  (Lodgment 12 at 24-26; Lodgment 15.)  However, the Superior Court of California rejected these claims in a reasoned decision.  (Lodgment 9 at 3-5.)  The Superior Court of California explained that Petitioner did not show that his counsel's conduct was: 1) objectively unreasonable; and 2) prejudicial to Petitioner.  (Lodgment 9 at 5.)  The Court looks through to the Superior Court's opinion and finds that the state court's denial of Petitioner's ineffective counsel claim was not an unreasonable application of, or contrary to, federal law as determined by the U.S. Supreme Court.  Robinson, 360 F3d at 1045.

Under federal law, a petitioner is entitled to habeas corpus relief for ineffective assistance of counsel only if he can show that his "counsel's representation fell below an objective standard of reasonableness," and, as a result, he was prejudiced.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  A "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  If a petitioner is challenging his counsel's reasonableness in deciding not to investigate certain aspects of his case, then the court should assess the counsel's decision by "applying a heavy measure of deference to counsel's judgments."  Id. at 691. Thus, a petitioner's conclusory allegations of ineffective assistance of counsel that are unsupported by the record are insufficient to warrant relief on federal habeas corpus.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).  Furthermore, the failure to make a futile motion is not ineffective assistance, and the failure to investigate inadmissible evidence is not considered deficient representation.  See id. 27.  A petitioner is prejudiced if his "counsel's errors were so serious as to deprive the defendant of a fair trial." Strickland, 466 U.S. at 687-88.  In other words, but for the counsel's errors, the petitioner would have received a more favorable result. Id.

///

///

06cv233

A.    Failure to Investigate Potential Third-Party Culpability

Here, Petitioner claims that if his counsel had interviewed Thess Good, then he would have discovered more third-party culpability evidence.  Petitioner insists that his counsel would have learned that the police offered Good benefits in exchange for information about Petitioner's whereabouts.  (Doc. No. 21 at 33.)  Armed with this information, Petitioner argues that his counsel could have put Good on the witness stand before the jury and presented Good's past criminal history, demonstrated Good's physical resemblance to Petitioner, and presumably, allowed them to conclude that Good had framed the Symbolic robbery on Petitioner.  (Id.)

In order to determine whether defense counsel's failure to investigate Petitioner's allegations about Good amounted to ineffective counsel, the Court must measure the likelihood that evidence obtained from Good  would have been admissible in California trial court.  See James, 24 F.3d at 27. Under California law, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime" in order for that third-party culpability evidence to  be admitted. People v. Avila, 38 Cal. 4th 491, 578 (2006).

The record supports three allegations about Good: 1) he looks like Petitioner, 2) he knows Petitioner, and 3) he has a criminal history.  (Lodgment 1 at 426-27.)  But, nothing from the record shows that Good was linked to Symbolic.  There is no evidence connecting Good to Jones and no witnesses identifying Good as one of the perpetrators.  Alone, Good's physical features, relationship to Petitioner, and criminal history are insufficient to establish a link between him and Symbolic. Therefore, information and testimony provided by Good would have been inadmissible as third-party culprit evidence.  Avila, 38 Cal. 4th at 578.  Furthermore, if the jury had been informed of Good's past criminal history and his association to Petitioner, it would have reflected poorly on Petitioner's moral character.  The jury would have wondered why Petitioner kept in contact with an ex-felon, and may have developed suspicions about the type of conduct in which Petitioner engages. Thus, the defense counsel's decision to not investigate inadmissible, or otherwise inculpating, evidence was not unreasonable.

///

///

06cv233

Petitioner also claims that his trial counsel should have investigated and interviewed William Diglio. (Doc. No. 21 at 33.) He claims that trial counsel would have discovered that Diglio's cell phone had Symbolic's phone number programed into it. (Id.) Petitioner explained that since Diglio is a federal parole violator, the discovery of a link between him and Symbolic would have been favorable evidence for Petitioner. (Id.) The Court finds that this claim is without merit. The record has no information about William Diglio. The Court can not simply assume that Petitioner's unsupported allegations about William Diglio are true. As such, Petitioner's conclusory allegation that Diglio is a federal parole violator and is connected to Symbolic, is unsupported by the record and insufficient for an ineffective assistance of counsel claim. James, 24 F.3d at 26.

Regardless of the admissibility or truth of Petitioner's allegations about third party culprits, it is unlikely that the testimony or information provided by Good and Diglio would have led the jury to reach a more favorable outcome for Petitioner. At trial, three victims identified Petitioner, and there was circumstantial evidence that linked Petitioner to Jones, who was linked to Symbolic by fingerprints. (Lodgment 2 at 60-72, 335-43, 138-41, 176, 184-85, 245-46, 266-67.) Good and Diglio, on the other hand, were not linked to Jones in anyway, other than by self-serving statements made by Petitioner. (Lodgment 1 at 437.) Considering these facts, it does not appear that Good's and Diglio's testimonies would have exonerated Petitioner. The failure to investigate Good and Diglio, therefore, was not prejudicial to Petitioner.

For the foregoing reasons, Petitioner has not offered sufficient support to overcome the Court's strong presumption of reasonable professional assistance by Petitioner's trial counsel. Strickland, 466 U.S. at 689. Further, Petitioner has not shown that the failure to investigate third party culpability evidence was prejudicial to him. As such, this Court finds that the state court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

B.    Failure to Investigate Victims' Meeting

Petitioner claims that the victims met and shared their recollections of the robbery after it took place, and contends that trial counsel should have investigated this meeting. (Doc. No. 21 at 34.)

///

06cv233

Petitioner also argues that had trial counsel done so, he would have learned that the victims' recollections of the robbery at the meeting were inconsistent with their testimonies and statements to the police.  (Id.)  Petitioner maintains that his counsel could have then presented his findings to the jury as impeachment evidence against the victims that identified Petitioner.  (Doc. No. 21 at 34.)

Despite his detailed accusations, Petitioner offers no evidence from the record that shows a meeting occurred.  Further, he offers no support for his assertion that the victims' recollections of the robbery differed between their alleged meeting and at trial.  Thus, Petitioner's allegation of a victims' meeting is unsupported by the record and cannot overcome the strong presumption that trial counsel's assistance was reasonable.  James, 24 F.3d at 26.

Even if trial counsel had investigated the incident and found impeachment evidence, there is no reason to believe the information discovered and presented would have changed the jury's impression of the victims.  At trial, there were already conflicting stories about the description of the perpetrators.  Some victims could identify the perpetrators, some could not.  (Lodgment 2 at 60-72, 138-141, 335-43.)  Each victim's description of the taller perpetrator, who was identified by two victims as Petitioner, was slightly different.  Some victims described the Petitioner as being six feet, four inches tall, some as being six feet tall.  Some victims thought Petitioner was skinny, some did not.  (Id. at 107, 134, 156, 336.)  Yet despite the differences in the victims' testimonies, the jury still found Petitioner guilty.  It appears that the jury found the victims credible despite their already conflicting testimony.  Petitioner has failed to demonstrate that additional conflicting recollections would have made a difference.  As such, the lack of an investigation into the meeting did not prejudice Petitioner.

 For the above reasons, the Court holds that the state court's rejection of this claim was a reasonable application of Supreme Court precedent.

C.    Failure to bring 911 Call to Jury's Attention

Petitioner maintains that trial counsel should have presented evidence of an emergency call made by a victim that contained descriptions of the perpetrators which were inconsistent with the descriptions that same victim later gave at trial.  (Doc. No. 21 at 34.)  For similar reasons to those discussed above, the Court finds that this claim has no merit.  Petitioner does not supported his allegation with evidence;

the Court is offered solely a naked claim.  Moreover, Petitioner offers no support suggesting, that had the purported call been presented to the jury, he would have received a more favorable outcome.

D.    Failure to Investigate What Neighboring Business Witnessed

Petitioner alleges trial counsel should have presented evidence that a neighboring business had noticed Symbolic was under surveillance by people in a vehicle prior to the robbery.  (Doc. No. 21 at 34.)  He claims that further investigations would have led to third party culpability evidence.  However, Petitioner is again short on evidence and specifics.  Petitioner does not explain how the investigation would have led to exculpatory evidence.  He offers no rationale on how the evidence would have changed the outcome of the proceedings.  Petitioner offers no support for the contention that counsel acted unreasonably.  Furthermore, Petitioner has not shown how his counsel's actions prejudiced him.  Unsupported contentions are not sufficient to overcome the Court's strong presumption that counsel acted reasonably.  James, 24 F.3d at 26.  As such, the state court's denial of this claim was a reasonable application of Supreme Court law.

## IX.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner claims that his appellate counsel was ineffective because he failed to bring certain claims raised in this Petition before the state court on direct appeal.  (Doc. No. 21 at 37; Trav. at 57-61.)  Petitioner complains that his appellate counsel raised only his confrontation claim and sentencing issues with the California Court of Appeals when his other unraised claims[13] were clearly meritorious.  (Id.)  This issue was presented only to the California Supreme Court.  The state high court denied Petitioner without comment.  (Lodgment 12; Lodgment 15.)  Therefore, the Court independently reviews this contention.  Himes, 336 F.3d at 853; Delgado, 223 F.3d at 981-82.

When a petitioner asserts that he received ineffective appellate counsel because his attorney failed to raise particular claims, the court should apply the Strickland standard.  The two prongs of the Strickland standard consist of determining whether the failure to raise claims was reasonable conduct, and whether that failure prejudiced the petitioner.  Smith v. Robbins, 528 U.S. 259, 288 (2000).

---

[13]Petitioner is referring to, among other things, his due process, Ex Post Facto Clause, void-for-vagueness, and insufficient evidence attacks on his conviction and sentence.  None of these claims were raised by appellate counsel on direct appeal to the California Court of Appeals.  (Lodgment 3.)

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather, may select from among them in order to maximize the likelihood of success on appeal." Id. In determining the reasonableness of appellate counsel, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith, 528 U.S. at 288, quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986).

Here, Petitioner complains his appellate counsel did not raise the following issues on direct appeal: 1) trial court erred in denying Petitioner's motion for new trial and that error violated Petitioner's due process rights; 2) California's Three Strikes law, as applied to Petitioner's sentence, violates the Ex Post Facto Clause of the Constitution; 3) California's Three Strikes law is void for vagueness; 4) Petitioner was convicted with insufficient evidence. (Lodgment 3.) On the other hand, Petitioner's appellate counsel did raise a confrontation claim, as discussed in Section IV (A)(1) of this Report and Recommendation. His appellate counsel also raised sentencing issues. (Doc. No. 21 at 37; Trav. at 57-61.) The state appellate court rejected Petitioner's confrontation claim, but found that the sentencing issues raised by appellate counsel had merit and reduced Petitioner's sentence to 52 years and 8 months. (Lodgment 5.) Since the state appellate court ruled for Petitioner, the four unraised claims were not "clearly stronger" than the sentencing issue. Smith, 528 U.S. at 288.

As to Petitioner's confrontation claim versus the four claims not raised on appeal, the Court has spent the preceding thirty pages discussing their merits. To summarize and avoid repetition, it will suffice to say all claims concerned here are weak or spurious. The confrontation issue is the best of the lot, but still deficient, unsupported by authority. Comparing the abominable against the merely bad, the four unraised claims are not "clearly stronger" than the confrontation claim. Smith, 528 U.S. at 288. Further, even had the unraised claims been argued by appellate counsel, success was implausible. See discussions supra Sections IV - VIII. Petitioner, then, was not prejudiced. Accordingly, Petitioner has not overcome the presumption of effective assistance of counsel. Id.

For reasons discussed above, the Court finds that the state court's rejection of Petitioner's ineffective appellate counsel claim was a reasonable application of Supreme Court precedent.

06cv233

# X. DEPRIVATION OF JURY TRIAL IN SENTENCING

Petitioner contends that his rights to due process and a trial by jury were violated when the trial court judge imposed upper terms for his sentence based on facts that were neither found by the jury nor admitted by Petitioner.  (Doc. No. 21 at 71; Trav. at 62-104.)  Petitioner presented this claim only to the California Supreme Court.  The state high court rejected the claim without comment. This court independently reviews the merits of this claim.  <u>Himes</u>, 336 F.3d at 853; <u>Delgado</u>, 223 F.3d at 981-82.

A.   California Determinate Sentencing Law

California's Determinate Sentencing Law requires a sentencing judge to select the middle term for a conviction unless she finds aggravating factors by a preponderance of the evidence, which allow imposition of the upper term.  CAL. PENAL. CODE. § 1170 (b).  Some of the aggravating factors include a determination of whether the crime was committed violently, whether the crime involved great bodily harm or threat of great bodily harm, whether the crime was carried out in a sophisticated fashion, whether the victims were particularly vulnerable, and whether the criminal had prior offenses. CAL. R. CT. 4.421(a)(1), 4.421(a)(8), 4.421 (b)(2).  Since this sentencing scheme allows the judge (instead of a jury) to find factors in determining punishment and sets the standard of finding these factors to be a preponderance of the evidence, it is subject to scrutiny under the Supreme Court's interpretation of the Fifth and Sixth Amendment.

B.   Constitutionality of Judge Determinations of Penalty Enhancing Findings

In <u>Apprendi v. New Jersey</u>, the Supreme Court held, other than a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  530 U.S. 466, 490 (2000).  The Supreme Court clarified its position in <u>Blakley v. Washington</u>, 542 U.S. 296, 303 (2004), stating, the "statutory maximum for <u>Apprendi</u> purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  A defendant forfeits his right to contest an <u>Apprendi</u> error on appeal if he fails to object to that error at trial unless the unraised error seriously affected the "fairness, integrity, and public reputations of the judicial proceedings."  <u>U.S. v. Cotton</u>, 535 U.S. 625, 631 (2002).  Thus, if a defendant fails to object to an <u>Apprendi</u> sentencing error at trial and

///

1   later claims such an error for habeas corpus relief, a reviewing court should determine whether the

2   factors relied upon to enhance the defendant's sentence were "uncontroverted at trial and supported by

3   overwhelming evidence."  See Cotton, 535 U.S. at 633.  If the record reflects that the factors were

4   overwhelmingly supported by evidence, then the defendant is barred from raising the claim.

5          When determining sentences within a prescribed statutory range, a judge is permitted to consider

6   factors based on facts found by the jury during trial.  Apprendi, 530 U.S. at 481.  Indeed, "both before

7   and since the American colonies became a nation, courts in this country...practiced a policy under which

8   a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist

9   him in determining the kind and the extent of punishment to be imposed within limits fixed by law."

10  Williams v. New York, 337 U.S. 241, 241 (1949).  In U.S. v. Booker, 534 U.S. 220 (2005), the high

11  court held that the Federal Sentencing Reform Act ("SRA") was unconstitutional because it bound

12  district judges to mandatorily impose a higher penalty for a convicted defendant upon finding any

13  statutorily proscribed aggravating factors by a preponderance of the evidence.  543 U.S. at 258.

14         Nevertheless, instead of invalidating the entire statute, the Supreme Court severed the mandatory

15  provisions of the SRA.  Id. at 259.  The end result was that a district judge may impose a higher

16  sentence within the maximum penalty prescribed by law upon finding an aggravating factor, but need

17  not do so.  Id. At 264.  The Supreme Court found that the SRA was constitutional if it served as an

18  advisory sentencing guideline for judges.  Id. at 233.  Indeed, a constitutional question on the SRA

19  would have been "avoided entirely if Congress had omitted...the provisions that make the Guidelines

20  binding on judges."  Id.  Justice Stevens explained, "when a trial judge exercises his discretion to select

21  a specific sentence within a defined range, the defendant has no right to a jury determination of the facts

22  that the judge deems relevant."  Id.

23         The high court's rationale for its severing efforts was to preserve the goal of Congress to "move

24  the sentencing system in the direction of increased uniformity" between the real conduct of offenders

25  and their sentences.  Id. at 253.  To illustrate, the Court used the following hypothetical:

26          Now imagine two former felons, Johnson and Jackson, each of whom engages in identical
            criminal behavior: threatening a bank teller with a gun, securing $50,000, and injuring an
27          innocent bystander while fleeing the bank.  Suppose prosecutors charge Johnson with one
            crime (say, illegal gun possession, see 18 U.S.C. § 922 (g)), and Jackson with another (say,
28          bank robbery, see § 2113(a))."

Booker, 534 U.S. at 253.

26

1    Under the SRA, a judge would have been required to sentence both Johnson and Jackson

2  similarly for their identical conduct because, presumably, he would find identical aggravating factors in

3  the commission of their crimes.  Id.  By making the SRA an advisory sentencing guideline, the high

4  court ensured that judges retained the discretion to sentence Johnson and Jackson similarly.  Id.  The

5  Supreme Court was concerned that if the SRA was completely invalidated or altered such that

6  aggravating factors must be submitted to juries, then two criminals who engage in similar conduct, but

7  are charged with different crimes, would be sentenced differently.  Id.  Such results would undermine

8  the Congressional intent of moving punishment and real conduct "in the direction of increased

9  uniformity."  Id.

10    The Supreme Court's analysis of the hypothetical makes clear that judges are permitted to

11  exercise discretion on sentencing, using factors based on evidence produced at trial.  See Apprendi, 530

12  U.S. at 481; see also, Booker, 543 U.S. at 253, Williams, 337 U.S. at 241.  The majority opinion went as

13  far as to suggest that a sentencing judge is permitted to interpret evidence adduced at trial, find that the

14  defendant engaged in certain conduct, and impose a sentence based on that conduct – even if a jury's

15  verdict does not reflect that conduct.  See Booker, 543 U.S. at 253.  For example, in the high court's

16  hypothetical, Johnson might be convicted of illegal gun possession without the jury finding that Johnson

17  committed bank robbery.[14]  However, a sentencing judge would be permitted to examine the evidence,

18  come to a conclusion that Johnson's conduct was dangerous and similar to a bank robbery, and sentence

19  him to a term similar to that of a criminal convicted of bank robbery.  Thus, while under Apprendi and

20  Blakey a judge may only enhance a sentence based on jury found facts,  Blakley, 542 U.S. at 303,

21  Booker suggests that aggravating factors based on these facts need not be found by the jury.  543 U.S. at

22  253.

23    The California Supreme Court, after considering Apprendi,  Blakley, and Booker, held that "the

24  judicial [fact-finding] that occurs when a judge exercises discretion to impose an upper term sentence or

25  consecutive terms under California law does not implicate a defendant's Sixth Amendment right to jury

26  trial."  People v. Black, 35 Cal.4th 1238, 1244 (2005).  The state high court reasoned that Blakley and

27  Apprendi did not hold that all sentencing schemes that involve judicial fact-finding were

28

_____

[14]Under the Supreme Court's hypothetical, the prosecutor does not charge Johnson with bank robbery.

unconstitutional.  Id. at 1253.  Relying on Booker, the state high court concluded that judges are permitted "to engage in the type of judicial factfinding typically and traditionally involved in the exercise of judicial discretion employed in selecting a sentence from within the range prescribed for an offense."  Id.  The California Supreme Court explained that the high court's goal in Blakley and Apprendi was to overrule sentencing schemes that "assign judges the type of factfinding role traditionally exercised by juries in determining the existence or non-existence of elements of an offense."  Id.

The state high court concluded that similar to the SRA as revised by Booker, California's determinate sentencing scheme "afforded judges the discretion to decide, with the guidance of rules and statutes, whether the facts of the case and the history of the defendant justify a higher sentence.  Such a system does not diminish the power of the jury..." to find elements of offenses.  Id.  Thus, the California Supreme Court held that California's sentencing system is consistent with Booker and is not contrary to Apprendi or Blakely.  Id.  But the U.S. Supreme Court overruled Black in Cunningham v. California, 127 S. Ct. 856, 868 (Jan. 22, 2007), holding California's determinate sentencing scheme unconstitutional because it lacked the jury trial and reasonable doubt elements of due process[15].  Three Supreme Court Justices[16] agreed with the state high court, and dissented in Cunningham.  They stated, "[t]he California sentencing law that the court strikes down...is indistinguishable in any constitutionally significant respect from the advisory Guideline scheme that the [Supreme] Court approved in [Booker]."  127 S. Ct. at 873.

C.    Retroactivity

Despite the overturning, the Supreme Court's holding in Cunningham does not apply retroactively on federal collateral review to upset a state conviction or sentence.  See Schardt v. Payne, 414 F.3d 1025, 1027 (9th Cir. 2005); see also Teague v. Lane, 489 U.S. 288 (1989).  Under Teague, a new procedural rule of constitutional law cannot be retroactively applied on federal collateral review to upset a state conviction.  489 U.S. 288.  There are two exceptions to this rule.  First, the new rule may be

---

[15]As discussed earlier, California's Determinate Sentencing Law requires that a sentencing judge find an aggravating factor by a preponderance of the evidence before she may impose an upper term sentence for a conviction.

[16]Justice Alito, Justice Breyer, and Justice Kennedy.

1    applied retroactively if it forbids "punishment of certain primary conduct" or if it prohibits "a certain

2    category of punishment for a class of defendants because of their status or offense."  Beard v. Banks,

3    542 U.S. 406, 416-17 (2004).  Second, the new rule may be applied if it is a "watershed rule of criminal

4    procedure implicating the fundamental fairness and accuracy of the criminal proceeding."  Id.

5         After Beard, the Ninth Circuit held that the rule in Blakley does not retroactively apply to

6    convictions that became final prior to its final publication in June 24, 2004.  Schardt, 414 F.3d at 1027.

7    The Ninth Circuit's reasoning was that Blakley presented a new procedural rule because it merely

8    allocated some of the decision-making authority previously held by judges to juries.  Id. at 1036.

9    Furthermore, the Ninth Circuit reasoned that the rule in Blakley did not fall within either exceptions

10   discussed in Beard.  Id.  Similar to Blakley, Cunningham shifted the decision-making authority

11   previously held by judges to juries, making it a procedural rule rather than a substantive rule.

12   Cunningham merely suggested that aggravating factors in the California Determinate Sentencing

13   Scheme used to impose an upper term must be found by a jury instead of a judge.  See Cunningham,127

14   S. Ct. 856, 868; see also Apprendi, 530 U.S. at 490, Blakley, 542 U.S. at 303.   Thus, like Blakley,

15   Cunningham should not be retroactively applied to convictions that were final prior to its publication.[17]

16   D.    Analysis

17        Here, Petitioner's conviction became final on March 18, 2006, ninety days after the California

18   Supreme Court denied Petitioner's petition.  See Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999).

19   Petitioner was sentenced to several upper terms as a result of the conviction after the sentencing judge

20   found several aggravating factors beyond a preponderance of the evidence.  (Doc. No. 21 at 75.)

21   Cunningham was decided on January 22, 2007.  Thus, for reasons discussed above, it may not be

22   applied to Petitioner's case.  Teague, 489 U.S. 288.

23        On the other hand, Blakey, as noted before, was decided on June 24, 2004, and Booker was

24   decided on February 22, 2005. Accordingly, the rules established in Apprendi and its progenies prior to

---

26   [17]While the retroactivity of Cunningham has not been addressed by the Ninth Circuit, several
     district courts, in their unpublished opinions, also found that Cunningham is non-retroactive.  Bouie v.
27   Kramer, No. CIV S06-1082-GEBGGHP, 2007 WL 2070330 (E.D. Cal. Jul. 13, 2007), Rosales v. Horel,
     No. 06-CV-2327-JMAJB, 2007 WL 1852186 (S.D. Cal June 26, 2007), Fennen v. Nakayema, No. 2:05-
28   CV-1776-GEBGGHP, --- F.Supp.2d ---, 2007 WL 1742339 (E.D. Cal. June 14, 2007),  Hally v.
     Scribner, No. CIV S-04-0828RBBCMKP, 2007 WL 809710 (E.D. Cal. Mar. 15, 2007); see Dropalski v.
     Stewart, No. C06-5697-FDB/KLS, 2007 WL 963989 (W.D. Wash. Mar. 28, 2007).

06cv233

1   Cunningham do apply to Petitioner's case, and the Court must determine if Petitioner is barred from

2   raising his Apprendi claim because he failed to raise the claim in trial court. Cotton, 535 U.S. at 633.

3           As previously discussed, when a defendant fails to raise an Apprendi claim at the trial court

4   level, he is barred from raising the issue on collateral review if factors used in enhancing his sentence

5   were "uncontroverted at trial and supported by overwhelming evidence." See Cotton 535 U.S. at 633.

6   Petitioner did not raise his Apprendi error claim for direct appeal from trial court.  (See Lodgement 3 at

7   i-iii.)  Therefore, the Court should determine whether the factors used to enhance his sentence were

8   uncontroverted and supported by overwhelming evidence. See id.

9           In sentencing Petitioner, the trial judge found that: 1) the crime involved great violence; 2) there

10  was threat of great bodily harm; and  3) the manner in which the crime was carried out indicated

11  planning, sophistication, and professionalism.  (Doc. No. 21 at 71.)  The evidence showed that two black

12  males used guns to rob Symbolic.  (Lodgement 11 at 1.)  The robbers forced Symbolic's employees to

13  move to the back of Symbolic's showroom and  threatened to shoot them if they did not comply.

14  (Lodgement 2 at 106-111.)  These facts show that the robbers were engaging in violent conduct.

15  Moreover, they show that robbers threatened to inflict great bodily harm on the victims.  Victims

16  testified that the robbers used cell phones to communicate and to discuss plans during the robbery.

17  (Lodgement 2 at 325-28; 43-5.)  This fact shows that the  robbers used fairly sophisticated

18  communications equipment to plan out their robbery.  And, of course, the jury found that Petitioner

19  committed the Symbolic robbery. (Lodgment 1 at 105-112)  In light of the record, threat of great bodily

20  harm and a high degree of sophistication in committing the crime were overwhelmingly supported by

21  the facts of the case.  Enhancing Petitioner's sentence based on these factors did not seriously affect the

22  "fairness, integrity, and public reputations of the judicial proceedings." Cotton, 535 U.S. at 631.

23  Petitioner's claim is therefore barred.  Cotton, 535 U.S. at 631.

24                          **XI. VALIDITY OF PRIORS**

25          Petitioner claims that he was denied due process when he was deprived of an opportunity to

26  attack the prior conviction that was used to enhance his sentence.  He contends that he was not provided

27  appellate counsel to appeal his prior conviction.  Also, on April 15, 2005, Petitioner filed a motion

28  requesting trial transcripts for his 1988 conviction, and it was denied by the state court.  (Doc. No. 21 at

87-88.)  Petitioner maintains that because he was denied counsel as well as the opportunity to review his

1    trial transcripts, he was deprived of his chance to attack the constitutionality of his prior conviction.  The

2    state courts did not address this issue. This Court independently reviews the factual record and finds the

3    claim without merit.  See  Himes, 336 F.3d at 853.

4           In Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394 (2001), the Supreme Court held

5    that, generally, a petitioner for a writ of habeas corpus has no right to collaterally attack the validity of a

6    prior conviction used to enhance his sentence.  Id. at 396.  The Court's rationale behind the general

7    Lackawanna rule is to prevent defendants from attacking the validity of their prior convictions after they

8    failed to "pursue those remedies while they were available" during the court proceedings for these prior

9    charges.  Id.

10          From Petitioner's allegations, the Court's best inference is that Petitioner did not pursue an

11   appeal after he was convicted of the prior.  He did not request court transcripts soon after his 1988

12   conviction.  Instead, he waited 18 years after he found out that the prior was going to be used to enhance

13   his sentence before filing a motion to request the transcripts.  (Trav. at 106.)  Petitioner is collaterally

14   attacking the validity of his prior only after he had learned that it would be used to enhance the sentence

15   of his most recent conviction.  Petitioner's conduct is a textbook example of one attempting to untimely

16   challenge the validity of his prior after he failed to do so at the appropriate juncture.

17          There is an exception to the Lackawanna rule: a petitioner may challenge his prior conviction if

18   he was not appointed trial counsel.  Lackawanna, 532 U.S. at 404.  However, Petitioner complains of a

19   lack of appellate counsel not trial counsel, and the exception does not apply.  Accordingly, Petitioner is

20   procedurally barred from attacking the validity of his prior conviction in this Court.  See id. at 406.

21                                   **XII. PROSECUTOR'S ERRORS**

22          Petitioner makes several claims, alleging that the prosecution did not timely disclose various

23   facts, police reports, and portions of police reports at trial.  He contends: 1) the prosecution did not

24   timely disclose page one and page two of the police report for Edward Jones' arrest, (doc. no. 21 at 92-

25   97; Trav. at 109-112); 2) the prosecution failed to timely disclose the police report of Thess Good's

26   arrest and detention, (Doc. No. 21 at 97-99); 3) the prosecution failed to disclose the  criminal history of

27   one of the victims of the Symbolic robbery, (doc. no. 21 at 99-100); and 4) the prosecution misidentified

28   Petitioner's pager number and presented it as Petitioner's cell phone number to the jury.  Petitioner

1    claims that the number was not Petitioner's cell phone number, but instead, his pager number.  (Doc.

2    No. 21 at 101-103.)

3         Petitioner asserts that the prosecutor's errors amounted to a due process violation because the

4    untimely disclosed and misidentified evidence was exculpatory.  Had the proper disclosures been made,

5    they could have been more thoroughly investigated during discovery.  Further, Petitioner maintains that

6    he was prejudiced at trial as a result of these errors.  (Lodgment 5 at 14-18; Lodgment 15.)  To evaluate

7    this claim, the Court will use the standard of review for disclosures by the prosecution discussed in

8    section IV(A)(2) of this Report and Recommendation.  In short, for relief to be granted, Petitioner must

9    show that the information that the prosecutor either failed to disclose or untimely disclosed was

10   exculpatory evidence and such prosecutorial misconduct prejudiced Petitioner from receiving a more

11   favorable verdict.  Brady, 373 U.S. at 87.

12   A.   Failure to Disclose Portions of Police Report for Edward Jones' Arrest

13        Petitioner contends that the prosecutor failed to timely disclose page one and page two of the

14   police report describing Edward Jones' arrest.  However, page one and page two of that police report

15   were disclosed to the defense on November 6, 1999, two days before trial ended.  (Doc. No. 21 at 100.)

16   Page one and page two of that police report has Petitioner's statement describing his version of what

17   happened on the day Jones was arrested.  (Lodgment 1 at 404.)  It also has a statement made by

18   Enterprise-Rent-A-Car employee Jennifer Poulin, who recalled that Petitioner called Enterprise at

19   around 9:30 a.m. to report the rental car missing.  (Lodgment 1 at 403.)

20        As discussed earlier, the state appellate court found that Petitioner's counsel acknowledged that

21   the evidence in page one and page two of the police report is hearsay.  (Lodgment 5 at 14-16.)  Thus,

22   even if the pages were disclosed earlier, they could not have been admitted as evidence.  See CAL. EVID.

23   CODE § 1200.  Further, because Petitioner knew that he made a statement to the police, he could have

24   simply chosen to take the stand and testify as to what happened on the day of Jones' arrest.  Lastly,

25   Petitioner's statement is hardly credible and not exculpatory because he "only called police to report the

26   vehicle stolen after Jones was arrested while driving in it."  (Lodgement 5 at 15.)  Accordingly, the

27   Court finds that the state appellate court's ruling was not contrary to, or an unreasonable application of,

28   federal law.  Robinson, 360 F3d at 1045.

1   The Court independently reviews Petitioner's claim regarding Jennifer Poulin's statement

2   because the state courts did not address the claim in their decisions.  See Himes, 336 F.3d at 853;

3   Delgado, 223 F.3d at 981-82.   Jennifer Poulin's statement does not exculpate Petitioner.  As discussed

4   earlier, Petitioner's story was already inconsistent with the Fam-Mart employee's recollection of events.

5   Poulin's statement also contradicted Petitioner's representations and would have further clouded

6   Petitioner's story.  According to the police report, Fam-Mart did not open until 10:00 a.m. on the day of

7   Jones' arrest. (Lodgment 1 at 405.)  According to Petitioner, he did not discover that his car was stolen

8   until after he entered Fam-Mart, which had to be sometime after 10:00 a.m, according to the Fam-Mart

9   employee.  (Id.)  Yet, Petitioner called Poulin at around 9:30 a.m. to report that the car was stolen.  (Id.)

10  Such inconsistencies would not have been favorable to Petitioner.  Instead they would have made the

11  jury further question Petitioner's credibility.  Thus, Poulin's statement would not have exculpated

12  Petitioner.  Since Poulin's recollection would not have been exculpatory, the failure to timely disclose

13  her statement did not harm Petitioner's defense and is not prejudicial.

14  B.   Failure to Disclose Police Report of Thess Good's Arrest and Detention

15  Petitioner alleges that prosecution did not disclose the police report of Thess Good's arrest and

16  detention until November 6, 1999, two days before the trial ended.  He claims that this lateness in

17  disclosure was prejudicial to him. (Doc. No. 21 at 97-99.)  Petitioner asserts that the police report

18  mentioned that Good, who allegedly looks like Petitioner, was detained.  Petitioner further claims that

19  the report failed to mention that incriminating items were confiscated from Good's home, such as "hand

20  guns, cell phones, etc." (Doc. No. 21 at 98.)  Petitioner maintains that these items and the police's

21  description of Good would have been exculpatory evidence had they been presented to the jury at trial.

22  (Id.) The state courts did not issue a reasoned decision addressing this claim.  Thus, the Court will

23  independently review Petitioner's contentions.  See Himes, 336 F.3d at 853.

24  As previously discussed,[18] in order for a petitioner to succeed on a claim of suppression of

25  evidence by the prosecution, he must show that the evidence withheld by the prosecution was favorable

26  to him.  Brady, 373 U.S. at 87.  Additionally, he must show that prosecution's suppression of the

27  evidence prejudiced him.  Id.  Conclusory allegations unsupported by specific statements of facts are

28

[18]The Court discussed the standard of review for a suppression of evidence claim in section IV
(A)(2) of this Report and Recommendation.

1   insufficient to warrant habeas corpus relief.  Boeheme, 423 F.2d at 1058.  Thus, a petitioner's

2   unsupported allegations of suppression of evidence that was favorable to him and resultantly prejudiced

3   him is insufficient to warrant habeas corpus relief.  See id.

4          With regard to Good's physical similarities and relationship to Petitioner, the Court has

5   discussed earlier that information about Good would not have been admissible as third-party culprit

6   evidence.[19]  Thus, even if the report were disclosed to Petitioner earlier, it would not have led to a more

7   favorable outcome because the information in the report would not have been presentable to the jury at

8   trial.  Furthermore, regardless of the likely admissibility of the information in question, the report was

9   indeed disclosed to Petitioner before the end of trial, and Petitioner had time to look at the report and

10  use its information to develop a defense. (Doc. No. 21 at 97-99.)  Thus, the untimely disclosure of the

11  Thess Good report did not prejudice Petitioner.

12         With regard to Good's items, Petitioner simply has not offered any support for the contention

13  that "guns, cell phones, etc." were confiscated from Good's home.  (Doc. No. 21 at 98.)  In fact,

14  Petitioner even notes that the Thess Good police report failed to state that any items were confiscated

15  (Id.) (emphasis added).  As habeas corpus relief can not be granted based on Petitioner's unsupported

16  allegations,  Boeheme, 423 F.2d at 1058, it should be denied as to this claim.

17  C.    Failure to Disclose Criminal History of Victim

18         Petitioner claims that the criminal history of a Symbolic robbery victim was not disclosed by the

19  prosecution.  He claims that the failure to disclose the criminal history prevented his counsel from

20  presenting impeachment evidence against this victim, who identified Petitioner as one of the

21  perpetrators of the Symbolic robbery at trial, but failed to do so at lineups.  (Doc. No. 21 at 99.)  The

22  state courts did not address this claim in a reasoned decision. After independent review, the Court finds

23  that this claim is without merit.  See Himes, 336 F.3d at 853.

24         Under California law, a witness may be impeached with a criminal record only where the offense

25  is one of "moral turpitude."  People v. Wheeler, 4 Cal.4th 284, 296  (Cal. 1992).  Here, Petitioner has

26  not specified the crimes with which the victim has been convicted.  Rather, Petitioner appears to be

27  unsure of whether or not the victim even has a criminal history.  He states, "information regarding a

28

   ───────────────────

   [19]Please refer to section IV (E)(2) of this Report and Recommendation.

1   potential criminal history of [victim]" was realized at trial.  (Doc. No. 21 at 102 (emphasis added).)

2   Conclusory allegations that border on speculation are all that Petitioner has offered to the Court.  As

3   unsupported contentions are not enough to warrant habeas corpus relief,  Boeheme, 423 F.2d at 1058,

4   Petitioner's claim should be denied.

5   D.    Allegation of Misidentifying a Pager Number

6        Petitioner alleges Detective Keene falsely reported his pager number 619-907-0408 as a cell

7   phone number and testified accordingly at trial.  (Doc. No. 21 at 101.)  Petitioner claims that he only has

8   a pager number.  (Id.)  Therefore, had Keene's information been corrected at trial, it would have been

9   exculpatory for Petitioner because witnesses testified that the Symbolic robbers used cell phones, not

10  pagers.  (Id. at 102.)  Respondents admit that the phone number was indeed a pager number.  (Doc. No.

11  28 at 28.)  However, Respondents note that cell phones subscribed under the names Tim Walker and

12  Crini Ornelas[20] called Petitioner's pager several times.  (Doc. No. 28 at 28; Doc. No. 21 at 147.)  The

13  state courts did not address this claim; thus, the Court will independently review its merits.  See Himes,

14  336 F.3d at 853.

15       To prevail on a claim that prosecutorial misconduct allowed the introduction of false evidence or

16  testimony into a trial, a petitioner must show: 1) "the testimony (or evidence) was actually false," and 2)

17  "the prosecution knew or should have known that the evidence or testimony was actually false."  United

18  States v. Zuno-Arce , 339 F.3d 886, 889 (9th Cir. 2003).  Petitioner must establish a factual basis for

19  attributing to the government knowledge of false evidence of perjury.  See Morales v. Woodford, 388

20  F.3d 1159, 1179 (9th Cir. 2004) Additionally, a petitioner must show that the false evidence, whether

21  deliberately or inadvertently disclosed by the prosecution, prejudiced the Petitioner such that there is

22  any reasonable likelihood that the false evidence could "have affected the judgement of the jury . . . ."

23  Giglio v. United States, 405 U.S. 150, 154 (1972); Zuno-Arce, 339 F.3d at 889.

24       Here, Respondents admit that Detective Keene falsely identified the number 619-907-0408 as

25  Petitioner's cell phone number.  However, Petitioner fails to support his contention that the prosecution

26  knew or should have known that Keene testified erroneously during trial.  As Petitioner failed to provide

27

28       [20]As discussed earlier, Detective Keene discovered that two cell phones had called each other
    thirty-two times on the morning of the Symbolic robbery.  He discovered that the two cell phone
    numbers were subscribed to two persons under the names of Tim Walker and Crini Ornelas.  (Lodgment
    2 at 282-84.)

1 | factual basis for attributing to the government knowledge of false evidence, he has not proven one of the

2 | elements of a prosecutorial misconduct claim. <u>See</u> <u>Morales</u>, 388 F.3d at 1179.

3 |    Furthermore, Petitioner has not shown that the false information was prejudicial. <u>See</u> <u>Giglio</u>,

4 | 405 U.S. at 154. Petitioner does not dispute that the pager number was his, and the evidence shows that

5 | the cell phones subscribed to persons under the names of Tim Walker and Crini Ornelas called the pager

6 | several times. (Doc. No. 21 at 147.)  The prosecution theorized that these cell phones were

7 | fraudulently obtained by Petitioner and another accomplice through the use of aliases. (<u>See</u> Lodgement

8 | 2 at 282-94.) Petitioner and the accomplice communicated through these cell phones to plan the robbery

9 | several days before and during its commission. (Lodgement 2 at 282-94.) While the prosecution and

10 | Defective Keene erroneously represented that the fraudulent cell phones were used to contact

11 | Petitioner's cell phone instead of his pager, this misrepresentation was not prejudicial to Petitioner.

12 | Whether the fraudulently obtained cell phones called Petitioner's pager number or cell phone number is

13 | immaterial because either way, one of the users of the cell phones attempted to communicate with

14 | Petitioner, as the prosecution theorized. (<u>See</u> Lodgment 2 at 282-94.) Petitioner has not shown how

15 | Keene's mistaken testimony or police report, if corrected, would have thwarted the prosecutor's theory.

16 | Even if Keene had testified that the number 619-907-0408 was Petitioner's pager number, the

17 | prosecutors still would have established a link between Petitioner's number and the cell phones

18 | subscribed to persons under Tim Walker's and Crini Ornelas' names. As such, Petitioner has not shown

19 | that Keene's false testimony prejudiced him. Thus, Petitioner should not be entitled to habeas corpus

20 | relief as to the prosecutorial misconduct claim.

### XIII.  LACK OF DUE PROCESS AT TRIAL

22 |    Petitioner claims that the trial court erred when it excluded the first two pages of the police

23 | report for Edward Jones' arrest. (Doc. No. 21 at 106; Trav. at 112-13.) As discussed earlier, those

24 | pages contained Petitioner's statement as to what happened prior to, and shortly after, Jones' arrest. The

25 | trial court excluded the two pages from evidence as inadmissible hearsay. (<u>Id.</u>) Petitioner claims that

26 | exclusion of such information was a due process violation. (<u>Id.</u>) The state courts did not address this

1  claim in a reasoned decision.[21]  After independent review of this claim, this Court finds that it is without

2  merit.  See Himes, 336 F.3d at 853.

3         Under Supreme Court authority, "erroneous exclusions of critical, corroborative defense

4  evidence may violate the Fifth Amendment due process right to a fair trial and the Sixth Amendment

5  right to present a defense." Depetris v. Kukeyndall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing

6  Chambers v. Mississippi, 410 U.S. 284, 294 (1973)).  However, a defendant's right to present relevant

7  evidence is not unlimited, but rather is subject to reasonable restrictions.  Taylor v. Illinois, 484 U.S.

8  400, 410 (1988).  Indeed, states have broad latitude under the Constitution to establish rules excluding

9  evidence from criminal trials.  U.S. v. Sheffer, 523 U.S. 303, 308 (1998).  A defendant must comply

10  with these rules of evidence "designed to assure fairness and reliability." Chambers, 410 U.S. at 302.

11  Under Supreme Court authority, an exclusion of evidence on hearsay grounds amounts to a due process

12  violation if the hearsay statement is material to the trial and the statement "bears persuasive assurances

13  of trustworthiness." Chambers,  410 U.S. at 302 (1973).

14         An example of a material statement that bears persuasive assurances of trustworthiness is

15  illustrated in Chambers.  In that case, the defendant was accused of murdering a police officer at a riot.

16  Id. at 285.  The police officer was shot and a subsequent autopsy revealed that he had been hit with four

17  .22-caliber bullets.   A third party, Gabe McDonald, was also at the riot the evening of the police

18  officer's death.  Id. at 287.  Shortly after the riot, McDonald gave a sworn statement to defendant's

19  attorney, confessing that he had shot the police officer with a .22-caliber revolver he owned.  Id.

20  However, McDonald later retracted his confession.  Id.  Nevertheless, the defendant tried to develop the

21  theory that McDonald shot the police officer.  Id. at 289.  The defendant had multiple witnesses, who

22  were good friends of McDonald, who testified that they saw McDonald shoot the police officer.  Id.

23  However, the defendant's efforts were partly thwarted.  The state court did not allow the defendant to

24  bring McDonald on the stand as an adverse witness, and the prosecution chose not to have him testify.

25  Id. at 291-92.  In addition, the state court excluded three of defendants witnesses, who planned to testify

26  that McDonald had admitted to shooting the police officer.  Id. at 293.  The three witnesses were all long

---

27

28      [21]While the California Court of Appeals did address whether the untimely disclosed police report amounted to a prosecutorial error, (Lodgement 5 at 14-18), and explained why the exclusion of the report was harmless to Petitioner, it did not analyze whether the information on the report was properly excluded from evidence by the trial court.

06cv233

1   time friends of McDonald.  Id. at 292-93.  The court excluded these witnesses on hearsay grounds.  Id. at

2   292.

3         However, the Supreme Court held that the defendant was deprived of a constitutional right to

4   either cross examine McDonald or bring in evidence of his confession.  Id.  The Supreme Court found

5   that the three witnesses were trustworthy because  "each of McDonald's confessions were made

6   spontaneously to a close acquaintance shortly after the murder had occurred" and "each one was

7   corroborated by some other evidence in the case - McDonald's sworn confession, the testimony of an

8   eyewitness to the shooting, and proof of his prior ownership of a .22-caliber revolver."  Id. at 300.

9   Thus, the high court ruled that because the witnesses' hearsay statements were material to the case and

10  they were trustworthy, the trial court committed a due process violation when it excluded their

11  testimony from evidence.  Id. at 302.

12        As for the hearsay statement at issue in the instant case, Petitioner's version of what happened on

13  the morning of Jones' arrest that was documented in the police report of Edward Jones' arrest  is

14  substantially different from the hearsay statements in Chambers.  In Chambers, witnesses saw

15  McDonald shoot the police officer.  McDonald confessed to the shooting.  McDonald had a gun of the

16  same caliber as the bullets found in the police officer's body.  Lastly, the people who were to offer the

17  hearsay statements were close friends of McDonald.  The totality of the evidence that corroborated the

18  hearsay statements in the case made them trustworthy.  Chambers, 410 U.S. at 302.  Conversely,

19  Petitioner has provided almost no corroborating evidence that comports with the version presented in the

20  police report.  Petitioner asserts that Edward Jones stole his car.  The only evidence that remotely

21  corroborates Petitioner's assertion is that Edward Jones was arrested while driving Petitioner's rental

22  car.  (Lodgement 2, 264-65.)  But there is no evidence supporting the contention that Jones stole the car

23  from Petitioner.

24        In fact, there are even inconsistencies between Petitioner's statement and the ones made by other

25  witnesses in the same report.  Petitioner's statement is inconsistent with Jennifer Poulin's statement and

26  the Fam-Mart employee's statement.[22]  Furthermore, not only are there no assurances that Petitioner's

27  hearsay statement is trustworthy, there is also no evidence that admission of the statement could have

28

_____

[22]These inconsistencies are discussed earlier in this Report and Recommendation.

1    made the jury doubt Petitioner's already waning credibility and moral character at trial.  Detective

2    Johnny Keene found potentially incriminating telephone numbers, ammunition, and an identification

3    card that appeared to be a fake in Petitioner's home.  Keene's testimony regarding these items were

4    submitted to the jury.  (Lodgment 2 at 280-318.)  In light of the evidence presented, Petitioner's

5    credibility was already in question at trial.  The presentation of his statement to the jury would have only

6    further damned his chances at receiving a favorable impression.  Thus, this Court finds that the trial

7    court's exclusion of Petitioner's statement was a reasonable application of Supreme Court authority.

## XIV.  CONCLUSION

8

9          For all of the foregoing reasons, it is hereby recommended that the Court issue an Order: (1)

10   approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered

11   **DENYING** Petitioner's writ of habeas corpus and dismissing this action.

12        **IT IS ORDERED** that no later than **September 21, 2007**, any party to this action may file

13   written objections with the Court and serve a copy on all parties.  The document should be captioned

14   "Objections to Report and Recommendation."

15        **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

16   served on all parties no later than **September 28, 2007**.  The parties are advised that failure to file

17   objections within the specified time may waive the right to raise those objections on appeal of the

18   Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 99th Cir. 1998); Martinez v. Ylst, 951 F.2d

19   1153, 1156 (9th Cir. 1991).

20

21   DATED: August 31, 2007

22

23

24                                                              Peter C. Lewis
                                                                U.S. Magistrate Judge
25                                                              United States District Court

26   cc:  The Honorable William Q. Hayes
          All Counsel of Record

27

28